At this time, we'll hear U.S. v. Famoletti. Good morning. Gerald Brannan, appearing on behalf of Charles Famoletti. We don't think there's any doubt that Famoletti was in custody when he was forcibly grabbed, pushed face first against a wall, handcuffed behind his back, and then frisked and then seated in the living room. And we think that the custody continued when Agents Thompson and Chirini escorted Famoletti into the bedroom, sat him on the bed, took two seats facing him, and with their backs against the closed door of the bedroom. He was obviously, and I think definitely, in custody during that entire time. You know, there's a good deal of sense in what you're saying, but our doctrines in this circuit make it a very hard argument to make. If you look at the Foulkes case, there were like nine people crawling over her house, FBI agents, and she was seated at her dining room table, and she was interviewed for an hour and a half or more. And whether she was free to leave, it sounds like it's basically the same case. Well, in this case, all doubt is removed because Agent Thompson implicitly admitted that he was in custody when, at the suppression hearing, he was unable to identify any time at which he would have allowed Famoletti to leave or that Famoletti could have left. He would have considered his options. But then when asked what those were, the judge cut him off. Does his state of mind matter? I'm sorry? Does the officer's state of mind, which is what I think you just told me, does that matter? Does it matter? Can you get closer to the mic, thanks? Yes. If I remember what I just said, sure. My question is, does the officer's state of mind, which is what I think you were just telling us, does it matter in this inquiry? Yes, I think it does because he stated, well, Thompson stated that he believed that Famoletti was not in custody. And I think his admission by not being able to identify on the stand any time at which he could see that Famoletti could leave, I think that's an open and shut case that it really was in custody. Was he handcuffed the entire time? He was handcuffed until they got to the bedroom, but I don't think that changes the analysis given what Thompson testified to at the suppression hearing. He was handcuffed for what period of time? Well, this happened very quickly. So he went from the living room. There was 10 minutes in the living room, and then they went to the bedroom, and pre-warning, there was another 10 minutes in which Thompson repeated the same things over. Was he handcuffed during those second 10 minutes? Well, the handcuffs were off in the bedroom, but I don't think that changes the analysis. I'm just trying to pin down this one fact. So when they removed him from the living room to the bedroom, the cuffs went off. That's my understanding. Yeah, the cuffs came off. But they were sitting in front of a closed door, and there was somebody guarding the door outside. Was he told that he was free to leave? Well, Agent Thompson kept saying to him, you're not under arrest, you're not under arrest. But the facts are different. I mean, he was forcibly handled. He was hysterical and forcibly handled, handcuffed and frisked out in the living room. But wouldn't the fact that he was frantic provide some reason for restraining him in some way? Absolutely. Rather than that being an indicium of arrest. Absolutely. The restraint for the protection of officers, because he was frantic. Well, there's two district courts, New York district courts, that have just recently acknowledged that a reasonable person finding himself restrained or handcuffed by the police would ordinarily conclude that they were under arrest. They were in custody, and that's exactly what happened here. But in the bedroom, I mean, he was wedged in the bedroom. He couldn't move. But what Thompson did, though, in both of those locations, he basically informed Familetti that, well, he didn't Mirandize them in the living room, and they didn't Mirandize them in the bedroom for the first ten minutes. Instead, he took those two periods to inform Familetti that they had a warrant, they were there to seize items, they were there to clear up matters, and they were there to find people who were raping kids and producing child pornography. And both times he asked for his help. Did he interrogate him? Did he ask him? What you're just describing is kind of a one-way information or whatever you want to call it, but a one-way process. My question is whether he was interrogated, I mean, asked, did you do this, where were you, that sort of thing, before the Miranda warning was given. Yes. Thompson's pre-warning accusations, I think, were the functional equivalent of custodial interrogation because he knew that confronting a suspect with evidence of guilt and requesting his cooperation, importantly, and finding those involved was reasonably likely to elicit an incriminating response. And that's what happened. Familetti said, you know, he said it the first time, he went through that litany of accusations, and then in the bedroom again without Mirandizing him, without even asking him any pedigree questions. And then when Familetti said, yep, I want to cooperate, I want to talk, that's when he Mirandized him. And then Familetti just, it was like the dam opening up. Promptless, he admitted everything. And I think that was an incriminating response based on Thompson's two-stage procedure here. Because there was available subjective and subjective evidence suggesting that Thompson employed a two-stage interrogation procedure to avoid Miranda, his subjective intent was, in fact, very relevant to the issue of deliberateness. And the court is obligated, the district court is obligated, in the words of the KPERS panel, to conduct a, quote, searching and penetrating inquiry of the officer's testimony and proffered reasons for delaying Miranda warnings. And the evidence that required the district court to do this is quite compelling. First, Thompson admitted that his goal was to get an elicit a confession from the outset. That was his goal. Second, he implicitly admitted that Familetti was in custody. When he testified at no point was he free to leave. Third, his testimony was demonstrably inconsistent. At the first suppression hearing, there were two of them, he categorically denied seeing Familetti in restraints. On cross-examination, he testified that he could not recall whether Familetti was handcuffed, and yet he insisted that he was focused on him. At the second suppression hearing, he testified he could not be certain whether Familetti was handcuffed, and then he testified unequivocally that he was not handcuffed. Thompson's inconsistencies further exposed by Agent Sherrani, who's ---- Your argument on the two-step Miranda violation, that does involve subjective intent of the officers. Yes. And this goes to show that. I mean, his inconsistent testimony, and Agent Sherrani, which was there, she unequivocally and credibly testified that Familetti's hands were secured behind his back when he was thrust against a wall and frisked, which is really logical when you consider the circumstances. As you say, there was a hysterical suspect. He needed to be restrained in order to do that frisk. In order to do that, he would have been handcuffed. So based on, with respect to the Siebert test, in terms of the deliberateness of Thompson's two-stage inquiry, we have continuity of personnel. It was Thompson making the accusatory statements before warnings, both in the living room and in the bedroom. We have continuity of questioning. He was the one doing the questioning in both places. Before you get to a two-step analysis, you have to establish that asking someone if they'll cooperate itself is a violation of Miranda. I think he did. We do have cases that say that. Yes, exactly. How do you distinguish them? He implicitly asked them to cooperate. He said, listen, we've got all the evidence against you. We know what you've done, and we want you to cooperate. So from the interrogation issue is looked at from the suspect's perspective, and the interrogator's intent is also relevant. So from Familetti's perspective, he's being told, listen, we've got all this evidence against you, and we want you to cooperate. What's he going to say? I mean, the government is all the time getting confessions and admissions from people by confronting them with their guilt and the evidence against them and saying, you know, all you've got to do is tell the truth and cooperate. So I think implicitly, Agent Thompson, by repeating what he did in the living room, in the bedroom, confronting him with evidence of his guilt and asking him to cooperate, he had to have known that was going to elicit an incriminating response, which was Familetti's agreement to tell all. You've reserved a minute to rebuttal. Thank you. We'll hear you then. Thank you. May I please the Court? Good morning, Your Honors. My name is Jessica Fender, and I represent the United States. I also represented the United States at trial. Your Honors, just to bring this into focus here, everything that has been discussed so far just establishes that Mr. Familetti, he was not in custody, but even if he had been, there was a valid knowing waiver of Mr. Familetti's Miranda rights. And as a result, and because there was no two-stage deliberate interrogation. Obviously, I think obviously our focus is on what happened before the Miranda warning, not what happened afterwards. That's correct, Your Honor. And I think in this case the facts are very clear about what happened. I do need to correct a couple of slight mischaracterizations, I think, of the record here. First of all, there is not testimony that it was ten minutes sort of pre-warning and then ten minutes, you know, between the chair and the bedroom and all that. As Special Agent Thompson testified and Special Agent Sherani testified, what happened here is very simple. The agents came into the apartment. Mr. Familetti was up against a wall. Special Agent Thompson testified that he was not clear about whether or not Mr. Familetti was in handcuffs at that time, but Special Agent Sherani said that she thought he was. In a matter of a few minutes, one or two minutes, Mr. Familetti was calmed down. Do we have findings on this? I mean, why go into this may have been the case and that may have been the case. Do we have findings? Absolutely. We do, Your Honor. What are those findings? I'm sorry, Your Honor. What are those findings? Those findings are, as I've said, Your Honor, yes, that it was just a few minutes between the time that Mr. Familetti was initially apprehended. The handcuffs were, as Judge Prescott found, undisputed that the handcuffs were taken off by the time that Mr. Familetti was brought into the bedroom. The law may be on your side, but maybe not. But the notion that he's in there in a bedroom and there are 10 FBI agents around the apartment and he feels, you know, you're free to leave and go to the neighborhood bar or something. I wouldn't feel free to leave under those circumstances. Well, Your Honor, first of all, I think there's a couple of things to unpack there. First, as the Court has already discussed, there's other opinions that make clear that that circumstance alone is not sufficient to find that somebody's in custody. I believe you pronounced it foes. I always say foe. I'm not sure what the right pronunciation is. Your French is very nice. Thank you. But even putting that aside, the free-to-leave inquiry is not the relevant one for purposes of custody under Miranda. The question here is whether Mr. Familetti or, frankly, a reasonable person in Mr. Familetti's circumstance would feel that they were under formal restraint consistent with being placed under formal arrest. Let's see. He's sitting on a bed in his own bedroom. Yes. But two people are facing him, and they're both police. And six or seven other people are searching his apartment, and they've told him that they know he's done some pretty terrible things. You think he could, a reasonable person, would say, excuse me, but, you know, I really have other things to do, get up and leave? Perhaps they would not want to leave, Your Honor, but that's different with regard to whether or not they would feel that. Pardon, Your Honor? You think he wanted to stay? I think it's often the case, Your Honor, and I think the court has recognized in the past, that when somebody is having a resident search of their premises, that they often do want to stay and to make sure of sort of what's going on and observe what's happening around them. I am not telling you, Your Honor, that he was factually free to leave. I am telling you, Your Honor, that he was specifically instructed that he was not under arrest, that he was free to leave, that handcuffs— I heard all that. The question is somewhat different. I mean, are you telling us that he was free to leave? As Special Agent Thompson— Was he free to leave? It's not clear from the record, Your Honor. As Special Agent Thompson— What was unclear? Special Agent Thompson— What was—I don't—you've lost me. You've laid out the record in some detail, and my question was whether he was free to leave. Your Honor, that question was put directly to Special Agent Thompson before the district court, and what he said, and as my opposing counsel here has stated, was that Special Agent Thompson, had Mr. Familetti actually tried to leave, would have reevaluated his options. But that does not, again, go to the question of whether or not Mr. Familetti was in custody for purposes of the Fifth Amendment. It's clear in this case that he was not, but even if he was, he was given both oral and in writing a Miranda warning, which he then waived in a written—he signed a written waiver of those rights. So even if this Court was to find that Mr. Familetti was in custody, which the government feels it's clear, and as Judge Preska found it was clear that he was not, there is still a valid Miranda waiver in effect here. And so there's really no— It's valid unless it's part of a two-step, and it might be part of a two-step if there's— if it violated Miranda to ask whether he would cooperate in an investigation of a child prostitution ring or a child pornography ring. Because after all, I mean, if a person's asked, we're investigating a plot to blow up the Statue of Liberty, would you cooperate? Unless you're involved in the plot to blow up the Statue of Liberty, you're going to say, I don't know what you're talking about. You're not going to say, yes, I'm happy to cooperate. How could you cooperate if you don't know anything? That's the trick part of that question, and it seems to me that once somebody says, yes, I will cooperate, or I put it to you, that once a person says, yes, I will cooperate in something as specific as a plot to prostitute children or to produce child pornography, they're already conceding that that's something that they do or that they are in that world. Your Honor, I respectfully disagree. I think that, as Your Honor's own experience, and as I think, frankly, many law enforcement officers would tell you as well, it is often the case that people will agree to speak with the law enforcement agents that are asking them questions and then either proceed to lie about their own involvement or to seek to minimize, or in some cases, of course, there's occasionally situations in which law enforcement has the wrong person, and they agree to cooperate to tell the truth and to exculpate themselves, which may be appropriate in that case. The opposing counsel here has cited no case, no law whatsoever. If you ask a question that gives somebody an opportunity to exculpate themselves, wouldn't that violate Miranda? I mean, the opportunity to exculpate yourself is the opportunity to inculpate yourself. Your Honor, here the question that I think is the focus is whether or not somebody would agree to speak with the agents further. That is not an interrogation under the case law of the circuit. Where would I look to find the exact question that was asked? Because would you cooperate is one thing. Would you agree to speak with us further is something else. What's the finding as to what the question was that was asked? Your Honor, I believe in the record that there were two times where Special Agent Thompson basically conveyed the same notion to Mr. Famoletti during and before his questioning. In one situation, prior to entering the bedroom, Mr. Famoletti was basically told, you know, we just want to clear some matters up, I think was the precise language, I'm not sure, but something like that. Would you agree to speak with us? And he said, okay. That was the earlier part of the interaction between the two. Later in the bedroom, Mr. Famoletti was advised in more detail. Special Agent Thompson showed him the search warrant, talked to him as Your Honor has suggested about sort of the nature of the investigation, and then he was asked, I think it was something along the lines of, you know, we're here to try to find people who are forcibly raping kids. Is that something that you can help us with? And Mr. Famoletti indicated that he would speak further. We're here to find people who are forcibly raping kids. Can you help us? Is that the question that was asked? Your Honor, the precise language, I'm not sure. I know that Mr. and I'm certainly happy to check the record briefly and try to get that for you. You can just tell me where to find it. Because you're getting very close to my example of blowing up the Statue of Liberty. Can you help us? Your Honor, again, if somebody has no information about the Statue of Liberty bombing attempt, then they also can answer that question and say, yes, I can help you. I have nothing to do with that. And you're looking in the wrong place. You're spending your resources in an inopportune time when you should be catching the bomber. Simply answering yes or no is not an interrogation. And I think the Rhode Island case makes that clear, that an interrogation is something specifically designed to elicit an incriminating response. It doesn't have to be a question. It can be actions. But it has to be something that an officer can reasonably foresee will elicit an incriminating response. That's not what happened here. And the question of whether someone will speak to you further or agrees to speak with you further. Judge Jacob's question was somewhat more subtle than your responses suggest you appreciate. Yes, Your Honor. I'm certainly happy to try to address it better. Perhaps Your Honor could rephrase the question or restate it for me then. There are questions eliciting information about something, to which the answer, yes, I can help, implies that you know about a thing. And if you know about it, that's incriminating. Your Honor, I... In other words, it's incriminating to admit that you know something about and can help and cooperate with respect to an investigation that is specifically described because it means that you wouldn't know anything about it unless you were involved in it. Your Honor, I do not think that there is any fact or circumstance or any case law that's been cited for that proposition. But separate and apart, and again, we're asking what is an incriminating question? Was this put into evidence? Was that question and answer put in evidence at trial? Your Honor, it was in the direct testimony of Special Agent Thompson. He described the circumstances of Mr. Familetti's statement. As I sit here today, I can't tell you precisely how that question and answer came in, but it was something along the lines of, as I've suggested to Your Honor, that there was an initial questioning period before Mr. Familetti was brought into the bedroom, that the question was something like, we would like to clear some matters up. Mr. Familetti agreed, which is, I think, frankly, the statement that the opposing counsel has largely pointed to as the, if you will, genesis of the two-step interrogation. There's nothing incriminating about being willing to clear some matters up. That's correct. Because you haven't been told yet what the matters are. That's correct, Your Honor. And I think that here, opposing counsel is asking, Your Honors, to adopt a circumstance in which if somebody is basically arrested and informed of the charges in any way, shape, or form against them and then asked if they want to speak, that that is necessarily an illegal two-step interrogation. There's no support in the case law or in common sense for that proposition, Your Honors. I see I've gone over my time. Whether he'd be willing to speak to them, or was he asked whether he'd be willing to cooperate? Your Honor, he was asked initially, and again, Special Agent Thompson's testimony is not exactly precise. I think the formulation does change. What's the finding? I mean, a lot of testimony is mixed up. That's why it's important to know what the . . . Yes, Your Honor. If you give me just one moment, I can direct you to . . . By all means. At the time, Chief Judge Presco's finding. So, Your Honor, in the record on pages, appendix page 182 and 183, Judge Presco states that she credited Special Agent Thompson's testimony to the effect that while in the bedroom, Mr. Familetti had calmed down, that he showed Mr. Familetti the search warrant, was told again that he was not under arrest, that he told Mr. Familetti that he wanted to ask some questions relating to child pornography, and that the agent's goal was to find people who were forcibly raping children and filming them, and that maybe Mr. Familetti would help. The judge then credited the testimony to the effect that Mr. Familetti agreed to help the agents, and then they asked pedigree questions, and that Mr. Familetti was then Mirandized, which again is in contravention to . . . Can you give me the record site? Of course, Your Honor. It's again at pages 182 and 183 of the, I believe it's the second appendix, volume two. It's sort of misleading, wasn't it? I mean, he's there to possibly get enough and arrest this person for what this person did, and to say I'm here in order to find somebody who's actually doing the raping and the filming is a bit misleading. Your Honor, it is not a misleading statement in the sense that the agents are also looking for people who are forcibly raping children and filming that. But this issue was also briefed below. It's not raised here on appeal. But as the government posited, and I believe was found by Judge Preska, there's no issue with statements like that. In fact, the idea that you've asked for cooperation, the idea that you've potentially indicated that you might be looking for other people who are more culpable, none of that creates an issue with respect to the voluntariness of the waiver here. More culpable. Yes, Your Honor, more culpable. Thank you. Thank you. Thank you, Your Honors. Thank you. Based on all the subjective and objective evidence that has been discussed in the briefs and here today, we don't believe the government has or cannot or can demonstrate by a preponderance of evidence that Thompson did not engage in a two-step procedure to avoid the Miranda warnings. And the court did not conduct the intense inquiry to verify that. The court just accepted Agent Thompson's testimony as credible, despite the inconsistencies in his testimony, and based on that, denied the suppression motion. So I think the court clearly erred by not conducting the appropriate inquiry that this court has identified in these situations. There was plenty of evidence to suggest a two-step procedure, and she was obligated to conduct that inquiry, and the court did not do that. Thank you. We'll reserve our decision. The case of United States v. Crute has taken on submission, and the case of Kim v. Kim has taken on submission. That's the last case on the calendar. Please adjourn.